[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a petition for the return of two minor children who have been removed by their mother from their home in Cordoba, Spain and are being wrongfully retained in the United States.[1]
The petition is brought by the father under the CT Page 8177 provisions of the Hague Convention on the Civil Aspects of International Child Abduction, hereinafter referred to as the Convention, and its implementing legislation in the United States, 42 U.S.C. § 11601 et seq. The Convention became effective in the United States on July 1, 1988 and from that date on, the Convention has been in force between the United States and other signatories.[2]
The Hague Convention provides for the prompt return of children abducted to, or wrongfully retained, in a country when both that country (here United States) and the country of the child's habitual residence (here Spain) are parties to the Hague Convention. The child(ren) must be under 16 and the return of the child is mandatory so long as a petition is filed within one year. There are very few exceptions to retaining the child and it applies whether or not there is an outstanding custody degree.
Pursuant to Article 8[3] of the Convention, the father has applied to the Central Authority in Spain for assistance in the return of his children.
Pursuant to Article 9[4] of the Convention, Spain has transmitted the application directly to the United States Department of State, the designated Central Authority of the United States under the Convention.
On March 25, 1991 a petition was filed by the father of the children pursuant to the terms of the Convention.
FACTS
Petitioner, JOSE SANCHEZ RENOVALES, and respondent, JAYNE AUDREY ROOSA, were married in Cordoba, Spain on June 16, 1979. They have two minor children who are lawful issue of the marriage, Julian Sanchez Roosa, age 9, born on August 23, 1982 in Spain, and Nicolas Sanchez Roosa, age 4, born on November 29, 1986, also in Spain. This family resided in Cordoba, Spain together with their children until the summer of 1990.
Each year during the summer months, the respondent, an American citizen, traveled to Granby, Connecticut to visit her mother and stepfather. The children accompanied her and on occasion so did the father. In June of 1990 the respondent traveled to Connecticut, with the children. However, a week before the family was scheduled to return to Spain in August, 1990, the respondent telephoned her husband in Spain and informed him that he did not need to pick her up at the airport because she would not be returning to Spain. She also stated CT Page 8178 that the children would remain with her in Connecticut.
On August 2, 1990 respondent applied for a motion for a temporary restraining order in the Connecticut courts. That order was granted ex parte by Steinberg, J. and continued until 90 days beyond November 14, 1990. On September 7, 1990 the Respondent filed a dissolution complaint, along with Pendente Lite motions. Based upon her motions, the respondent was granted custody of the children and petitioner was ordered to pay $175.00 per child for an effective order of $350.00 per week. This court (Kaplan, J.) stayed the dissolution pending the resolution of this petition for return.
In Spain, the father commenced an action in the Court of First Instance, seeking custody of the minor children, exclusive use of the marital home, visitation, child support, a legal separation and divorce. On May 8, 1991, the Spanish court, Cabollaro, J., issued orders granting temporary custody to the father with visitation rights to the mother after the court interviews the children.[5]
WRONGFUL REMOVAL/RETENTION OF CHILDREN
In this case the evidence shows that the children were part of an ongoing functioning nuclear family living in Cordoba, Spain. As per practice in the past, the Respondent and the children came to the U.S.A. for summer vacation in 1990. This time, however, she refused to return to Spain and she and the children remained in Connecticut. The evidence is clear that neither the father nor children had any warning of the respondent's plans to remain in Granby, Connecticut. This court finds that at the time of removal both parents and the children were habitual residents of Cordoba, Spain. In accordance with Article 3(b)[6] of the Convention, this court finds that the removal and retention of the children was wrongful.
In accordance with Article 12[7], this court finds that the motion for return of the children was commenced in a period of less than one year. In accordance with Article 12, once the court finds that the removal is wrongful (and that a petition was filed within one year) the Convention states that the authority concerned shall order the return of the child(ren) forthwith. However, in accordance with Article 13(b)[8] of the Convention, the respondent claims: there is a grave risk that their return would expose the child(ren) to physical or psychological harm or otherwise place the child(ren) in an intolerable situation.
Both sides produced an expert to assist the court in its CT Page 8179 findings. Most of the testimony centered around the father, his family and his relationship with the oldest boy, Julian. The mother's testimony surrounded her illness and how it stressed the children and the family structure.
The wife alleges that her husband was physically abusive to Julian in his method of disciplining him, by hitting the child. She further alleged that her husband was obsessed with making the boy eat excessively, to the point that he developed a vomiting reaction at night, along with nightmares. The record indicates that Julian, as the firstborn, was subject to high expectation by the father, to the point that the father instilled parental fear within the boy, possibly subjecting him to nightmares. As for the younger boy, Nicolas, the testimony was very scant. Due to his age, it was mostly hypothetical and assumed that he would be treated by his father similar to Julian, which would cause him harm. It was also felt that he would have a problem reacquiring his native language if returned.
The testimony about the mother centered around the fact that she had cancer of the tongue and had to undergo three separate operations. The evidence shows that her tragedy affected the family structure, as would be expected, but impacted most upon Julian, who fears the possible loss of his mother.
PSYCHOLOGIST'S TESTIMONY
Article 13(b) of the Convention requires that the child be placed in a "grave risk" of harm. Webster's New World Dictionary, 2nd College Edition defines grave as:" of a threatening nature; indicating great danger; ominous [a grave illness]". In the psychological context this court accepts Dr. Grenier's definition that "grave" . . . "it would be that their day-to-day functioning and their ability to function at all would be most urgently wiped out or done away with to the point that the person could not conduct a normal kind of life."
a. BURDEN OF PROOF
Since the respondent has conceded that the children were habitual residents of Spain they must prove by clear and convincing evidence that the children should not be returned under Article 13b. The Appellate Court in Shaffer v. Lindy,8 Conn. App. 96, 104 (1986), stated
 "[C]lear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, as CT Page 8180 where this high standard is required to sustain claims which have serious consequences or harsh or far-reaching effects on individuals, to prove willfull, wrongful and unlawful acts, to justify an exceptional judicial remedy, or to circumvent established legal safeguards."
Each or the parties had a well-qualified psychologist testify to assist the court. For the petitioner Dr. Julia Ramos Grenier, and for the respondent Dr. David Mantell. Each examined the parents and their children in various combinations. Dr. Mantell had more opportunity to examine the respondent and the children because he was employed prior to the Convention petition. Dr. Grenier is bilingual, she spoke Spanish when necessary, and examined with tests designed for Hispanic individuals. Each expert administered a battery of tests they felt necessary and proper.[9]
In order to understand the testimony of the experts their opinions must be separately analyzed for each child. Nicolas Sanchez Roosa, born in November of 1986 is the easiest child to address. Both experts believed that he was a normal, happy, healthy young boy. Being so young he was not a good subject for interviewing or testing. The record is devoid of any psychological manifestations of harm being exhibited by the child, except that the child would have to reacquire proficiency in the Spanish language if he is returned to Spain. Thus the court finds that Nicolas would not be subject to a grave risk of physical or psychological harm or otherwise place him in an intolerable situation. In fact when counsel for the respondent was questioned by the court in his closing argument, to his credit he agreed that Nicolas would not be subject to a grave risk.
The older boy Julian Sanchez-Roosa who turned nine on August 23rd of this year is a much more difficult subject. At birth Julian was described by his mother as "temperamental, irritable, difficult and tense." At the very early age of eight months he started to experience "projectile vomiting." This vomiting, while somewhat common in children, usually stops when the child outgrows it, or if there are physical causes, the child is operated upon. Dr. Mantell testified that the number of vomiting incidences happened two or three times in a week, followed by a lapse of two or three months and then the child would experience another bout of short duration. However, Dr. Mantell found that the length and frequency of the projectile vomiting was a sign of grave harm to the child.
Dr. Mantell testified that Julian exhibited stress which came mostly from his father and less from his mother's CT Page 8181 illness and his fear of her possibly dying. Mrs. Roosa testified that her husband was a domineering, excessively controlling, hostile and temperamental man. He and his family were constantly interfering with their personal family life and were obsessed with food. That food obsession led to the father force-feeding the child, which in turn caused the child to vomit at night. According to Mrs. Roosa, that led the father to scream at, threaten, humiliate and hit the child. In his diagnosis the respondent's expert testified that the mother's tragic bout with cancer and her life-threatening operations have also contributed to Julian's diagnosed post-traumatic stress disorder. Dr. Mantell went on to testify that if this condition was left untreated it . . . "is likely to lead to problems with anger control and anger problems in interpersonal relationships" in Julian.
When Dr. Mantell was asked as to whether the children would be subject to grave risk if returned to Spain he replied in the affirmative. His opinion was based upon the theory that if the children were returned they would interpret it as losing their mother. It was the experts' opinion that outright loss and/or forcing the mother to return to Spain in order to be with her children would hold the same degree of harm. Dr. Mantell stated that for the children to be separated from the mother posed greater damage to the children than to be separated from the father. If Julian was sent back to Spain he would become anxious and fearful and could develop into an anti-social personality.
In contrast Dr. Grenier's findings as to Julian were very different. While she found the child to be suffering from various stressors she found him to be an openly communicative child who was very bright.[10] She found him to be experiencing a combination of depression and anxiety and classified it as an emotional disorder. It was Dr. Grenier's opinion that Julian's life had significant stressors presently. In the order of importance she stated the stressors consist of:
1. Mother's long-term illness and the possible threat of death.
2. Marital stress and the difficulties of his parents.
3. His mother's emotional stress to her own illness.
4. His abrupt removal from his home environment/coming to a new culture/having to develop a facility to learn a new language quickly/having to do well in school.
5. Insecurity due to his future living arrangements. CT Page 8182
6. Control issues with his father.
Not surprisingly it was the opinion of Dr. Grenier that the children would not be subject to any grave harm if they were returned to Spain to be with the father.
During the hearing the issue of whether the children would be treated in Spain arose. Dr. Grenier testified that Julian's problems were treatable in Spain; curiously Dr. Mantell felt that he could not be treated satisfactorily there. This court finds it inconceivable that such limitations exist in Spain. In posing the issue of treatability the question of the father's visitation with the boys arose. It was Dr. Mantell's opinion that the father should be given extensive visitation with the children.
In reviewing the record, this court finds that the opinion of Dr. Grenier more credible. Each expert's diagnosis is very close as for the reasons the child Julian presently needs help. However, the respondent's expert prognosis is too severe. Except for the projectile vomiting incidents, Julian has sailed through his childhood signposts exceptionally. Recognizing there have been family problems this child still has graduated and progressed to each new grade. He is doing well academically in the school system in America and he has achieved this in a very short period of time. This child mastered two languages and has compared and expressed opinions on the differences in school and his friends in the United States and Spain. As both experts testified, Julian loves his father, mother, brother and uncle. The court is confident that this bright kid, with proper help, will be able to survive without serious harm to his physical and psychological well-being.
REPORT OF COUNSEL FOR CHILDREN
Attorney Antonio Robaina was appointed as counsel for the children by Kaplan, J. His charge was very specific: "He is not being asked to advise the Court what the desire of the children is and as far as where they should live. He is not being asked to advise the Court of what is in the best interest of the children at the present time since that is not an added issue in this case. And he is not being asked to advise the Court from the children's perspective on the jurisdictional question. He is simply being asked to make an investigation and advise the Court on the questions raised by the wife as to the alleged abuse of one or both of the children, either physical or psychological, and the allegation that the children might be caused severe psychological damage CT Page 8183 if they are returned to live with the father in Spain."
As counsel for the children, he interviewed both parents, and spent time with the children in each parent's company. He also participated at each hearing actively, cross-examining some of the witnesses.
In his report to the Court he made the following findings: The children have an attachment to both the mother and father; and that both parents were good people. He faulted the father for not being an ideal father, however, he felt that his conduct did not rise "to the level [of grave harm] that is spoken about in the statute." Attorney Robaina also recognized that there may be some damage to the kids if they are returned home. Lastly, his finding was that the move will not cause severe psychological harm to the children.[11]
CONCLUSION
The court finds that the respondent has failed to prove by "clear and convincing" evidence that the children will be "exposed" to grave risk of either physical or psychological harm or that they will be placed in an intolerable situation. In arriving at this conclusion the court finds that both parties love the children deeply. While the father may be a stern taskmaster for his children, the evidence, when objectively weighed and measured, shows a man who loves his children, has provided for them adequately, and who wants the best for his kids. Certainly, he is not perfect, but what the court heard was cultural differences in family child rearing that became more pronounced as love disappeared from the spousal relationship. When both parents struggle, the heat and din of the battle masks the positive contributions of both sides to the children. Perceived wrongs become amplified in the extreme.
The mother's desire to live away from her husband in the United States forms the basis of this tragedy. I have no doubt that the respondent wants only the best for her children. Include within the picture the physical and psychological trauma of her illness and her actions to date are understandable, but NOT acceptable by this court and the law of the United States. She chose to love, marry, have children and live in Spain. The consequences of those choices must be faced. To allow any person to just rip their children out of their country of residence, for whatever reason, cannot be condoned by a court.
While ordering these children to be returned to Spain, the court can only hope that the respondent, rather than CT Page 8184 fighting further with its attendant emotional and financial drain, will accept the order of the Court and work out a satisfactory arrangement with her husband. With dual citizenship being possessed by both children, they can benefit from both cultures in an enlightened and wonderful way. To postpone settlement of this issue is to subject both Julian and Nicolas to further psychological scarring.
Both countries, Spain and the United States, offer wonderful and unique cultures, with neither exclusively offering more, or greater guarantees of success in child upbringing.
It is the Order of this Court that both children be returned to the custody of their father in Spain within 21 days of the date of this order. It is further ordered that the United States and Spanish passports of the children be turned over to this court immediately. The respondent is to present airline tickets to Spain to this Court, arrange for the petitioner to pick the boys up in the United States or have them returned by an acceptable escort to Spain.
In accordance with the Convention,[12] the respondent shall pay for the airline tickets to return the children to Spain and shall pay to the petitioner $1,000 in counsel fees.
NORKO, J.
FOOTNOTES